AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
## UNDER SEAL
for the
### Eastern District of Virginia

FILED

NOV 1 3 2017

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

|  |  |
|---|---|
| In the Matter of the Search of<br><br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>An Apple iPhone with the Verizon Wireless<br>cell phone number "703-963-7705,<br>in the possession of Lauren A. Rhodes | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 1:17sw  778

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
An Apple iPhone with the Verizon Wireless  cell phone number "703-963-7705 in the possession of Lauren A. Rhodes in Middleburg, Virginia

located in the _____Eastern_____ District of _____Virginia_____ , there is now concealed *(identify the person or describe the property to be seized):*
evidence and instrumentalities, more particularly described in Attachment B, regarding the sale of endangered species and other wildlife previously smuggled into the United States and a conspiracy to engage in the further smuggling and sale of wildlife

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 16 U.S.C.  § 1538 | Endangered Species Act |
| 16 U.S.C.  §§ 3372-73 | Lacey Act |
| 18 U.S.C. § 545 | Smuggling |

The application is based on these facts:
See Attached Affidavit

- ☐ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Stuart G. Curtin, Jr., Fish & Wildlife Service Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____11/13/2017_____

City and state: _____Alexandria, VA_____

_____ /s/ _____
Ivan D. Davis
United States Magistrate Judge



**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF VIRGINIA**

Alexandria Division

UNDER SEAL

IN THE MATTER OF SEARCHES AND )
SEIZURES INVOLVING PROPERTY OWNED )   NO. 1:17sw  778
BY OR IN THE POSSESSION OF )
KEITH R. FOSTER, PAMELA J. FOSTER )
AND/OR LAUREN A. RHODES )

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Stuart G. Curtin, Jr., being first duly sworn, hereby depose and state as follows:

1.     I was the affiant on the Affidavit executed before Magistrate Judge Michael S.
Nachmanoff on May 8, 2017, in support of a warrant to search the contents of three email
accounts registered to The Outpost.  As explained in that Affidavit ("the May 8th Affidavit"),
The Outpost is a business owned and operated in Middleburg, Virginia, by Keith R. Foster ("K.
Foster") and Pamela J. Foster ("P. Foster"), and employs Lauren A. Rhodes ("Rhodes").   In
essence, the May 8th Affidavit set forth probable cause to believe that K. Foster, P. Poster, and
Rhodes engaged in the sale in interstate commerce of endangered species previously smuggled
into the United States, and a conspiracy to engage in the further smuggling and sale of protected
wildlife, in violation of 16 U.S.C. § 1538 (the Endangered Species Act), 16 U.S.C. §§ 3372-73
(the Lacey Act), and 18 U.S.C. § 545.  I incorporate the contents of the May 8th Affidavit here.

2.     I make this Affidavit in support of an application under Rule 41 of the Federal Rules
of Criminal Procedure for a warrant to search and seize property for evidence, fruits, and
instrumentalities of that crime, which are likely to be found in the following locations and in the
following devices:

A.   The real property and premises known as 6 South Madison Street, Middleburg, Virginia, upon which is situated the business known as "The Outpost", and which property and premises is more particularly described on Attachment A, ("BUSINESS PREMISES");

B.   The real property and premises known as 9160 John S. Mosby Highway, Upperville, Virginia, upon which are situated the business facilities called "The Keep" and "The Cottage", and which property and premises is more particularly described on Attachment A, ("STORAGE PREMISES");

C.   The real property and premises, including all curtilage and outbuildings, known as 1306 Greystone Road, Upperville, Virginia, more particularly described on Attachment A, ("RESIDENCE PREMISES");

D.   An Apple iPhone with the AT&T cell phone number "859-619-3727" known to be used by and likely to be found in the possession of K. Foster ("K. FOSTER'S CELL PHONE"); and

E.   An Apple iPhone with the Verizon Wireless cell phone number "703-963-7705" known to be used by and likely to be found in the possession of Rhodes ("RHODES' CELL PHONE").

Based on the facts contained herein and those facts contained in the May 8th Affidavit, there is probable cause to believe that within the above locations there exists evidence, fruits, and instrumentalities, more particularly described in Attachment B of this Affidavit, regarding the sale of endangered species and other wildlife previously smuggled into the United States and a conspiracy to engage in the further smuggling and sale of wildlife, in violation of 16 U.S.C. § 1538; 16 U.S.C. § 3372-3373; and 18 U.S.C. § 545.

3.   The facts set forth in this Affidavit are based on my personal knowledge and observations made during the course of this investigation, information conveyed to me by other law enforcement officials and witnesses, and the personal review of records, documents, and other physical evidence obtained during this investigation. This Affidavit contains information necessary to support probable cause. It is not intended to include each and every fact and matter

2

observed by me or known to the United States Government. When I assert that a communication

was made on a certain date, I mean that the communication was made "on or about" that date.

     A.    The BUSINESS PREMISES

    4.    Pursuant to paragraphs 11, 12, and 13 of the May 8th Affidavit, the BUSINESS

PREMISES is an antiques business called The Outpost, which is known to sell wildlife mounts

and handicrafts made from wildlife parts which were previously imported into the United States.

    5.    A public records search shows that the BUSINESS PREMISES was purchased by the

"K &P Foster LLC" in 2012. The "K & P Foster LLC" was registered with the Commonwealth

of Virginia State Corporation Commission in 2012. The registered agent listed for the company

is K. Foster and the registered agent's address is listed as the RESIDENCE PREMISES.

    6.    A public records search shows "The Outpost LLC" was registered with the

Commonwealth of Virginia State Corporation Commission in 2012. The registered owner of the

business is K. Foster and the principle office for the business is listed as the RESIDENCE

PREMISES.

    7.    As described in Paragraphs 26 and 49 of the May 8th Affidavit, a FWS undercover

agent ("UC1") made purchases of endangered species and other wildlife from the BUSINESS

PREMISES on December 21, 2016 and April 12, 2017. During those instances, the transaction

receipts provided to UC1 for the purchases of wildlife were from "The Outpost LLC."

    8.    As described in Paragraph 45 of the May 8th Affidavit, during the March 9, 2017

container inspection, FWS agents found that the container held foreign merchandise belonging to

The Outpost, including approximately 100 pieces of undeclared wildlife items. Furthermore,

FWS agents observed that the foreign merchandise was packaged in distinctive wooden crates

that displayed the company logo of The British Shop ("TBS") and in cardboard boxes that were

secured with distinctive tape that also displayed the TBS company logo. FWS agents observed

some foreign merchandise, including undeclared wildlife items, were labeled with TBS stickers

that contained the phrase "K. Foster – Outpost" or "K. Foster – Keep." FWS agents also

observed that the exterior of some of the boxes and crates within the container were labeled

either "Outpost" or "Keep." FWS agents photographed these labels, boxes, and crates.

9.    On March 17, 2017, UC1 received an email from K. Foster. In the email, K. Foster

told UC1 that a container of merchandise was delivered to The Outpost earlier in the day. K.

Foster explained that U.S. Customs searched the entire container so he was hopeful that the two

sawfish blades are still within the packed boxes. Furthermore, K. Foster stated he and his staff

would unpack the boxes and crates on Tuesday [March 22nd].

10.    On October 25, 2017, UC1 visited the BUSINESS PREMISES. At the time of the

visit, the shop was closed. During the visit, UC1 observed wildlife pieces being advertised for

sale in the front window of the shop, to include crocodile leather suitcases, crocodile leather

flasks, a porcupine quill box, and ostrich feather dusters. During the visit, UC1 observed that

The Outpost hours and contact information (including K. FOSTER'S CELL PHONE number)

were displayed in the front window adjacent to the front door of the shop.

11.    On October 26, 2017, UC1 received an email from info@theoutpostmiddleburg.com ,

which advertised the arrival of a new shipment of foreign merchandise at the BUSINESS

PREMISES. Included in the email were photographs of protected wildlife pieces, along with the

hours of operation for The Outpost stating that it is open to the public five days a week.

12.     Between October 23 and November 1, 2017, UC1 exchanged numerous emails with K. Foster in order to schedule a visit to the BUSINESS PREMISES for the purpose of purchasing foreign merchandise including wildlife. In those emails, K. Foster provided UC1 with dates that K. Foster and P. Foster would be staffing The Outpost throughout November. In those emails, UC1 scheduled a shopping visit at The Outpost for November 17th. K. Foster stated that both he and P. Foster would be present at the shop that day.

13.     From my own visits to the BUSINESS PREMISES as recently as October 2017, I know that the BUSINESS PREMISES is a commercial building located at 6 South Madison Street, in Middleburg, Virginia, that is owned by "K & P Foster LLC." The building is a one-story structure on the west side of South Madison Street, and shares common walls with other businesses. The structure is approximately 2,210 square-feet in size, and its exterior façade is painted in a cream-white color and contains large glass windows on either side of the front door. The words "The Outpost" are written in black lettering against the cream-white backdrop above the front door, which is painted black. The roof is black metal with two false window dormers that face east. There is a cobblestone sidewalk between the front door of the business and South Madison Street. The property address "6" is written in black on a post to the left of the front door. To the right of the front door there is a large oval hanging sign that says "The Outpost." I have also observed photographs of the BUSINESS PREMISES on The Outpost website (www.theoutpostmiddleburg.com), which photographs are included on Attachment A (and incorporated here).

B.    The STORAGE PREMISES

14.    A public records search shows that the two buildings at the STORAGE PREMISES were purchased by "K & P Foster LLC" in November 2015.

15.    Information found on The Outpost website states that the buildings located at the STORAGE PREMISES are managed by the business located at the BUSINESS PREMISES. The Outpost, The Keep, and The Cottage all share the same website and it appears they are essentially managed as one business.

16.    After clicking The Keep link on The Outpost website the viewer is instructed to call The Outpost or email info@theoutpostmiddleburg.com to schedule an appointment for The Keep. After clicking The Cottage link on The Outpost website the viewer is instructed to follow a link to a Vacation Rental By Owner ("VBRO") website to rent The Cottage. The information listed on The Outpost website for The Cottage states that it is furnished with "antiques from around the globe sourced from our destination shops The Outpost in Middleburg and The Keep in Upperville."

17.    A check of the VBRO provided link (www.vrbo.com/831907) shows interior photographs of The Cottage and decorations made from wildlife can be seen within.

18.    The Keep and The Cottage opened to the public around April 2016.

19.    Pursuant to paragraphs 38 and 39 of the May 8th Affidavit, UC1 conducted a site visit to The Outpost on January 13, 2017, where he met with Rhodes. Audio from the visit was recorded by the FWS. During the visit, Rhodes told UC1 that The Outpost and The Keep share and combine inventory on a regular basis.

20.   Pursuant to paragraphs 42 and 48 of the May 8th Affidavit, the emails received by the FWS provided business hours and contact information for both The Outpost and The Keep.

21.   On November 1, 2017, K. Foster sent UC1 an email stating that the STORAGE PREMISES is currently the "holding area for our new stock" that won't fit at the BUSINESS PREMISES.

22.   On November 7, 2017, The Outpost Instagram page posted an advertisement encouraging viewers to "Book your stay at The Outpost Cottage." Within the advertisement was a VBRO identifier 831907 for The Cottage, which is located at the STORAGE PREMISES.

23.   FWS agents have monitored The Outpost website and Instagram pages on a weekly basis throughout 2017. As recently as November 8, 2017, those pages showed newly advertised displays of imported wildlife pieces for sale including endangered species and other protected wildlife.

24.   From my own visits to the STORAGE PREMISES as recently as April 2017, I know that the STORAGE PREMISES consists of two commercial buildings at 9160 John S. Mosby Highway, in Upperville, Virginia, that are owned by "K & P Foster LLC." The buildings are advertised to be an antiques shop called "The Keep" and a vacation rental called "The Cottage", respectively. The Keep building is a one-story structure with vaulted ceilings and is approximately 1,380 square-feet in size. The Cottage building is a one-story structure and is approximately 770 square-feet in size. Each building's exterior façade appears to be made of stucco or brick and is painted in a cream-white color with black trim and accents. There is a stone parking lot shared by each building and located just east of The Keep and just south of The Cottage. At the front of the property there is a large sign that reads "The Outpost" with the

7

words "The Keep" and "The Cottage" directly below it. I have also observed photographs of the STORAGE PREMISES on The Outpost website, which photographs are included on Attachment A (and incorporated here).

### C.    The RESIDENCE PREMISES

25.    A public records search shows that the RESIDENCE PREMISES was purchased by K. Foster and P. Foster in 2014. I know that K. Foster and P. Foster reside at the RESIDENCE PROPERTY through surveillance photographs which observed their vehicles regularly coming and going from the property during March and April 2017. From February through April 2017, the FWS maintained a surveillance camera overlooking the driveway leading to the RESIDENCE PREMISES. During the period, the camera captured photographs of vehicles driving toward and away from the RESIDENCE PREMISES, including vehicles known to be owned and operated by K. Foster and P. Foster.

26.    Surveillance photographs captured on March 21, 2017 at approximately 2:32PM show a tan or silver pick-up truck carrying multiple large, wooden crates that are similar to the crates observed by FWS agents during the March 9th inspection, driving inbound on the driveway towards the RESIDENCE PREMISES. Surveillance photographs captured on the above date at approximately 3:01PM again show a tan or silver pick-up truck carrying a large, wooden crate that is similar to the crates observed by FWS agents during the March 9th inspection, driving inbound on the driveway towards the RESIDENCE PREMISES. And, on the above date at approximately 3:13PM, surveillance photographs show the same tan or silver pick-up truck, with nothing visible in the truck bed, driving outbound on the driveway away from the RESIDENCE PREMISES.

27. Surveillance photographs captured on March 22, 2017 at approximately 4:43PM show a white FedEx Express van driving inbound on the driveway towards the RESIDENCE PREMISES. A check of FedEx records shows that a package was delivered to the RESIDENCE PREMISES on March 22, 2017 at 4:45PM. The package, which shipped from Germany, was addressed to "The Outpost, 1306 Greystone Road, Upperville, VA 20184 US."

28. A check of UPS records shows that a package was delivered to the RESIDENCE PREMISES on October 23, 2017 at 12:09PM. The package, which shipped from Germany, was addressed to "The Outpost, 1306 Greystone Road, Upperville, VA 20184 US."

29. For a variety of reasons, I know that K. Foster and P. Foster still reside at the RESIDENCE PREMISES. First, UPS and FedEx records show that K. Foster and P. Foster regularly receive packages at this location, including a package in October 2017. Second, bank records obtained by subpoena reflect that K. Foster and P. Foster regularly receive bank statements at this address. Third, records from the Virginia Department of Motor Vehicles reflect the RESIDENCE PREMISES to be their residence. Finally, I have observed social media accounts known to be operated by the Fosters to contain photographs of the RESIDENCE PREMISES, with the most recent postings of the property being found on P. Foster's Instagram page in October 2017, which consisted of photographs and video of the property.

30. From my own visits to the area of the RESIDENCE PREMISES as recently as April 2017, I know that the RESIDENCE PREMISES is located at 1306 Greystone Road, in Upperville, Virginia, and is owned by K. Foster and P. Foster. The property address "1306" is written on a black mailbox at the head of the driveway and adjacent to the mailbox stands a tall wooden sign that reads "CLOUDS HILL" and points towards the residence. According to the

9

photographs of the house and property available on the real estate website www.homevisit.com, which photographs are included on Attachment A (and incorporated here), the house sits on the west side of Greystone Road, to the rear of an approximately 52-acre parcel at the end of a driveway that is approximately 1400 feet long. The house is a two-story "Cape Cod" style residence with a basement, an attached garage, and is approximately 3,600 square-feet (above ground) in size.  The house faces east and its exterior façade is comprised of a red brick with light blue shutters.  The roof is covered in gray shingles and there are four brick chimneys visible along the roof line; two along the north side of the house and two in the center of the roof (one on the center front of the roof and one on the center back).  There is an attached garage on the south side of the house.

### D.   K. FOSTER'S CELL PHONE

31.   K. FOSTER'S CELL PHONE number is regularly advertised as a contact number on The Outpost website, on the exterior windows of the BUSINESS PREMISES, and on printed advertisements and business cards made available to the public by The Outpost.

32.   Pursuant to paragraphs 19, 22, 24, 30, and 44 in the May 8th Affidavit, the email communications from K. Foster to FWS agents each contained the phrase "Sent from my iPhone" in the signature line of the email.

33.   On April 12, 2017, UC1 sent a group text message to K. FOSTER'S CELL PHONE and RHODES' CELL PHONE.  In the text message, UC1 thanked K. Foster and Rhodes for the sawfish blades purchased by UC1 earlier that day.  Later that day UC1 received a reply text from K. FOSTER'S CELL PHONE, in which K. Foster apologized for the condition of shop during the April 12th visit.

10

E.    RHODES' CELL PHONE

34.    Pursuant to paragraphs 27 and 47 in the May 8th Affidavit, the email communications from Rhodes to FWS agents each contained the phrase "Sent from my iPhone" in the signature line of the email.

35.    Pursuant to paragraph 47 in the May 8th Affidavit, during the April 6, 2017 phone call between Rhodes and UC1, Rhodes asked for UC1 to provide his cell phone number. Rhodes then told UC1 that she was going to text UC1 photographs of wildlife pieces (on behalf of The Outpost) while talking with UC1. The phone conversation was recorded by the FWS. During the phone conversation, UC1 received numerous text messages from RHODES' CELL PHONE which included photographs of numerous wildlife items previously smuggled into the United States, to include sawfish blades, a mounted barn owl, and other wildlife pieces to include pieces made from tortoiseshell and crocodile.

36.    Pursuant to paragraph 49 in the May 8th Affidavit, during the April 12, 2017 site visit to the BUSINESS PREMISES, UC1 purchased the above mentioned sawfish blades, barn owl, and pieces made from tortoiseshell from K. Foster and Rhodes. As noted in Paragraphs 5, 6, and 7 of the May 8th Affidavit, sawfish, sea turtles (which are utilized to make tortoiseshell), and crocodiles are all listed as "threatened or endangered" under the Endangered Species Act.

37.    On April 13, 2017, UC1 sent a text message to RHODES' CELL PHONE asking if she would email a receipt to UC1 from the April 12th visit. Later that day UC1 received a reply text from RHODES' CELL PHONE, in which she said she would resend the receipt to UC1 on April 14th when she returned to the BUSINESS PREMISES.

38. On April 15, 2017, UC1 sent a text message to RHODES' CELL PHONE again asking for an email receipt from the April 12th visit and for photographs of a leather rhinoceros piece that K. Foster offered to sell UC1 for $3,000 during the April 12th visit. Later that day UC1 received multiple reply texts from RHODES' CELL PHONE, in which Rhodes sent UC1 two photographs of the rhinoceros piece.

39. The piece in question was a full-bodied rhinoceros statue, which was made of leather and was about the size of a football. In the location on the statue where a horn should have been there was translucent material that appeared to be consistent with real rhinoceros horn, though UC1 was not certain of its authenticity. When UC1 questioned K. Foster about the horn during the April 12th visit, K. Foster denied it was made from real rhinoceros horn and instead told UC1 that the horn was made from bone. All species of rhinoceros found in the scientific family Rhinocerotidae are listed as either endangered or threatened under the Endangered Species Act.

40. On November 2, 2017, UC1 traded text messages with RHODES'S CELL PHONE, during which Rhodes stated that she would be present at The Outpost on November 17th.

41. Based on records of the Virginia Department of Motor Vehicles, as well as my own observations of Rhodes' vehicle parked at the address listed as her residence as recently as October 25, 2017, I believe Rhodes resides on Stonewall Court, in Middleburg, Virginia. Pursuant to a November 2, 2017 text message conversation between UC1 and RHODES' CELL PHONE, I know that Rhodes plans to be in and around Middleburg on November 17th.

42. Based on the foregoing, there is probable cause that K. Foster, P. Foster and Rhodes have engaged in the sale of endangered species and other wildlife previously smuggled into the United States and a conspiracy to engage in the further smuggling and sale of wildlife, in

violation of 16 U.S.C. §1538 (the Endangered Species Act), 16 U.S.C. § 3372-3373 (the Lacey Act), and 18 U.S.C. § 545. Furthermore, there is probable cause that evidence of these offenses is located within the BUSINESS PREMISES, RESIDENCE PREMISES, STORAGE PREMISES, K. FOSTER'S CELL PHONE and RHODES' CELL PHONE.

43.     Based on my training and experience, I know it is required of those involved in business to maintain records of their business activities for extended periods of time and records of their places of business for tax purposes and other reasons. These records identify the nature of the business, business practices, customers, employees, contractors, and subcontractors of the business, and contracts and other documents delineating the terms and agreements between the business and its customers and between the business and its employees, contractors, and subcontractors.

44.     Based on my training and experience, I know that those involved in business often maintain records of inventory and sales in order to properly manage merchandise, and to predict and plan for future needs. These records often include not only a list of the current merchandise on hand, but also a list of suppliers and contact information for those suppliers, a list of clients and contact information for those clients, pricing lists, previous sales, import and shipping records, and future merchandising plans.

45.     Based on my training and experience, I know that wildlife smugglers often keep an additional set of records, sometimes known as "hidden books" that describe in detail the illicit purchase, sale, and transportation of wildlife. I know that these hidden books often provide a more accurate and honest documentation of the totality of the unlawful activity, when compared to the legitimate business records.

13

46. Based on my training and experience, I know that individuals in the United States that owns, operate, or are employed by a business that specializes in foreign merchandise need to regularly communicate with foreign suppliers and shipping companies to arrange meetings and purchases, and to receive quotes, invoices, and tracking information regarding shipments. I know that communicating with foreign suppliers and shipping companies can be done through a variety of media, such as through cellular phones and computers.

47. Based on my training, experience, and information provided to me by technical experts, I know that an iPhone and/or other similar cellular devices known as smartphones have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, PDA, and as a device capable of accessing the Internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the devices.

48. For these reasons, I believe records found within K. FOSTER'S CELL PHONE and RHODES' CELL PHONE , as well as within any other electronic storage media located at the BUSINESS PREMISES, STORAGE PREMISES, and/or RESIDENCE PREMISES will likely contain evidence regarding the purchase, transport, and sale of endangered species and other wildlife; the smuggling of said endangered species and other wildlife into the United States from foreign counties; and the conspiracy to engage in the further smuggling and sale of wildlife.

## SEARCH AND SEIZURE OF ELECTRONIC STORAGE MEDIA

49. *Electronic Storage Media.* As used in this Affidavit, the term "electronic storage media" includes all equipment that can store, collect, analyze, create, display, convert, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. This includes any

14

data- processing devices (such as central processing units, memory typewriters, self-contained "laptop" or "notebook" computers, and cellular phones and "smartphones"); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, transistor-like binary devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); related communication devices (such as routers, modems, cables, and connections, recording equipment, RAM or ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

50. As described in this Affidavit and in Attachment B, this application seeks permission to search for records that might be found at and/or within the BUSINESS PREMISES, STORAGE PREMISES, RESIDENCE PREMISES, K. FOSTER' S CELL PHONE, and RHODES' CELL PHONE, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

51. *Probable cause.* I submit that within K. FOSTER'S CELL PHONE, RHODES' CELL PHONE, and within any computer or storage medium is found on the BUSINESS PREMISES, STORAGE PREMISES, and/or RESIDENCE PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

15

a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

e.  Based on actual inspection of other evidence related to this investigation, I am aware that computer equipment was used to generate, store, and access digital files. There is reason to believe that there is a computer system currently located on the BUSINESS PREMISES, STORAGE PREMISES, and/or RESIDENCE PREMISES.

52. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium found in the BUSINESS PREMISES, STORAGE PREMISES, and/or RESIDENCE PREMISES because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

    b. Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates)

17

may be evidence of who used or controlled the computer or storage medium at a relevant time.

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

53. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete

18

electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

54. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later

review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## APPLE DEVICE TOUCH ID

55. As described in Attachment A to this Affidavit, K. FOSTER'S CELL PHONE and RHODES' CELL PHONE are Apple brand devices, namely iPhones. Additionally, in my training and experience, it is likely that the BUSINESS PREMISES, STORAGE PREMISES, and/or the RESIDENTIAL PREMISES will contain at least one Apple brand device, such as an iPhone or iPad, because FWS agents have observed iPhones and iPads at the BUSINESS PREMISES and FWS agents have received emails from K. Foster and Rhodes that included signature blocks that said "Sent from my iPhone" and "Sent from my iPad."

56. I know from my training and experience, as well as from information found in publicly available materials including those published by Apple, that some models of Apple devices such as iPhones and iPads offer their users the ability to unlock the device via the use of a fingerprint or thumbprint (collectively, "fingerprint") in lieu of a numeric or alphanumeric passcode or password. This feature is called Touch ID.

57. If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) found at the bottom center of the front of the device. In my training and experience, users of Apple devices that offer Touch ID often enable it because it is considered to be a more convenient way to

20

unlock the device than by entering a numeric or alphanumeric passcode or password, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

58.    In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode or password must be used instead. These circumstances include: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days. Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time. Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; and (3) five unsuccessful attempts to unlock the device via Touch ID are made.

59.    The passcodes or passwords that would unlock the Apple devices known as K. FOSTER'S CELL PHONE and RHODES' CELL PHONE; and those passcodes or passwords that would unlock the Apple device(s) found during the search the BUSINESS PREMISES, STORAGE PREMISES, and/or RESIDNCE PREMISES, are not known to law enforcement. Thus, it will likely be necessary to press the finger(s) of the user(s) of those Apple devices to the device's Touch ID sensor in an attempt to unlock the device for the purpose of executing the search authorized by this warrant. Attempting to unlock the relevant Apple device(s) via Touch ID with the use of the fingerprints of the user(s) is necessary because the government may not

otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

60.    In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device via Touch ID, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all.  Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device.  Thus, it will likely be necessary for law enforcement to have the ability to require any occupant of the BUSINESS PREMISES, STORAGE PREMISES, and/or RESIDENCE PREMISES to press their finger(s) against the Touch ID sensor of the locked Apple device(s) found during the search of those locations in order to attempt to identify the device's user(s) and unlock the device(s) via Touch ID.

61.    Based on these facts and my training and experience, it is likely that K. Foster is the primary user of K. FOSTER'S CELL PHONE and thus that his fingerprints are among those that are able to unlock the device via Touch ID.

62.    Based on these facts and my training and experience, it is likely that Rhodes is the primary user of RHODES' CELL PHONE and thus that her fingerprints are among those that are able to unlock the device via Touch ID.

22

63.     Although I do not know which of a given user's 10 fingerprints is capable of unlocking a particular device, based on my training and experience I know that it is common for a user to unlock a Touch ID-enabled Apple device via the fingerprints on thumbs or index fingers. In the event that law enforcement is unable to unlock the Apples devices as described above within the five attempts permitted by Touch ID, this will simply result in the device requiring the entry of a password or passcode before it can be unlocked.

64.     Due to the foregoing, I request that the Court authorize law enforcement to press the fingers (including thumbs) of K. Foster, Rhodes, or any individuals found at the BUSINESS PREMISES, STORAGE PREMISES, or RESIDENCE PREMISES to the Touch ID sensor of the Apple brand device(s), such as an iPhone or iPad, found at those locations, for the purpose of attempting to unlock the device via Touch ID in order to search the contents as authorized by this warrant.

## CONCLUSION

65.     Based on the foregoing, there is probable cause to believe that, within the BUSINESS PREMISES, STOARGE PREMISES, RESIDENCE PREMISES, K. FOSTER'S CELL PHONE and RHODES' CELL PHONE there exists evidence, fruits, and instrumentalities related to the sale of endangered species and other wildlife previously smuggled into the United States and a conspiracy to engage in the further smuggling and sale of wildlife, within the Eastern District of Virginia and elsewhere, in violation of 16 U.S.C. §1538; 16 U.S.C. § 3372-3373; and 18 U.S.C. § 545.

66.     Wherefore, I request that search warrants be issued pursuant to Rule 41 authorizing me and my colleagues to search the locations and devices described in Attachment A; to seize

23

the items described in Attachment B; and to press the fingers (including thumbs) of K. Foster,

Rhodes, or any individuals found at the BUSINESS PREMISES, STORAGE PREMISES, or

RESIDENCE PREMISES to the Touch ID sensor of the Apple brand device(s), such as an

iPhone or iPad, found at those locations, for the purpose of attempting to unlock the device via

Touch ID in order to search the contents as authorized by this warrant; all of which will lead to

evidence, fruits, and instrumentalities of the aforementioned crimes, as well as to the

identification of individuals who are engaged in the commission of those and related crimes.

67.    I further request that this Court issue an Order sealing, until further order of this Court,

this Affidavit and the applications for the warrants. Sealing is necessary because the items and

information to be seized are relevant to an ongoing investigation, and premature disclosure of

the contents of this Affidavit and the application for the warrants may have a negative impact on

this continuing investigation and may jeopardize its effectiveness.


FURTHER THIS AFFIANT SAYETH NOT.

Stuart G. Curtin, Jr.
Special Agent, FWS


Subscribed to and sworn before me on this 13th day of November 2017.

/s/
Ivan D. Davis
United States Magistrate Judge

24

## ATTACHMENT A - BUSINESS PREMISES

The property to be searched is the commercial building located at 6 South Madison Street, Middleburg, Virginia, 20117.

The building is located in Loudoun County, in the Commonwealth of Virginia and is owned by "K & P Foster LLC", which is company registered to K. Foster.  The building sits in downtown Middleburg and is advertised to be an antiques shop called The Outpost, which is open to the public.  The building adjoins other businesses on either side and shares common walls.  The building is a one-story structure and is approximately 2,210 square-feet in size.  The building is located on the west side of South Madison Street.  The building faces east and its exterior façade is painted in a cream-white color and contains large glass windows on either side of the front door.  The words "The Outpost" are written in black lettering against the cream-white backdrop above the front door, which is painted black.  The roof is black metal with two false window dormers that face east. There is a cobblestone sidewalk between the front door of the business and South Madison Street.  The property address "6" is written in black on a post to the left of the front door.  To the right of the front door there is a large oval hanging sign that says "The Outpost."




## ATTACHMENT A - STORAGE PREMISES

The property to be searched are the two commercial buildings located at 9160 John S. Mosby Highway, Upperville, Virginia 20184.

The buildings are located in Fauquier County, in the Commonwealth of Virginia and are owned by "K & P Foster LLC", which is a company registered to K. Foster.  The buildings sit in downtown Upperville and are advertised to be an antiques shop called The Keep and a vacation rental called The Cottage, respectfully.  The Keep building is a one-story structure with vaulted ceilings and is approximately 1,380 square-feet in size.  The Cottage building is a one-story structure and is approximately 770 square-feet in size.  Both buildings are located on the north side of John S. Mosby Highway (also known as Route 50).  Each building's exterior façade appears to be made of stucco or brick and is painted in a cream-white color with black trim and accents.  Each building has a roof is black metal. There is a stone parking lot shared by each building and located just east of The Keep and just south of The Cottage.   At the front of the property there is a large sign that reads "The Outpost" with the words "The Keep" and "The Cottage" directly below it.

**THE KEEP**                          **THE COTTAGE**





## ATTACHMENT A - RESIDENCE PREMISES

The property to be searched is the residence, including all curtilage and outbuildings, associated with 1306 Greystone Road, Upperville, Virginia 20184.

The residence is located in Fauquier County, in the Commonwealth of Virginia and is owned by K. Foster and P. Foster. The house sits to the rear of an approximately 52 acre parcel and sits at the end of a driveway that is approximately 1,400 feet long. The house is a two-story "Cape Cod" style residence with a basement, an attached garage, and is approximately 3,600 square-feet (above ground) in size. The house is located on the west side of Greystone Road, which is signed as a private road. The house faces east and its exterior façade is comprised of a red brick with light blue shutters. The roof is covered in gray shingles and there are four brick chimneys visible along the roof line; two along the north side of the house and two in the center of the roof (one on the center front of the roof and one on the center back). There is an attached garage on the south side of the house. The property address "1306" is written on a black mailbox at the head of the driveway. Also at the head of the driveway adjacent to the mailbox stands a tall wooden sign that reads "CLOUDS HILL" and points towards the residence.





**Figure 6**



## ATTACHMENT B - Items to be Seized

The items to be searched for and seized consist of evidence, fruits and instrumentalities of violations of 16 U.S.C. § 1538 (the Endangered Species Act), 16 U.S.C. § 3372-3373 (the Lacey Act), and 18 U.S.C. § 545, regardless of whether found in physical form or in/on electronic devices and media, that were created, modified, or accessed during the period of January 1, 2013 to present.

As used below, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer, smart phone, or electronic storage (such as flash memory or other media that can store data) and any photographic form.

1.      Records and information, including but not limited to documents, letters, memoranda, ledgers, messages (including mobile telephone text messages), notes, maps, import records, personal telephone directories, telephone records, contracts, diaries, receipts, shipping addresses, and photographic material (including all images, including but not limited to negatives and prints), video and audio recordings, in any format, that relate to the purchase, transport, shipping, receipt, possession, ownership, transfer, or sale of endangered species and other wildlife;

2.      Records of any travel from the United States and/or to England by Keith R. Foster, Pamela J. Foster, Lauren A. Rhodes, or others affiliated with them;

3.      Records regarding the purchase, sale, or shipping of foreign merchandise, including but not limited to, invoices, purchase orders, shipping manifests, shipment tracking records, cancelled checks or bank statements, transactional records, tax records, and wire transfer confirmations or requests;

4.      Records, including pamphlets, brochures, letters and correspondence, relating to federal, state, or foreign statutes and regulations governing the purchase, transport, shipping, receipt, possession, transfer, or sale of endangered species and other wildlife, and records reflecting knowledge or understanding of such regulations by Keith R. Foster, Pamela J. Foster, Lauren A. Rhodes, or others affiliated with them;

5.      Any items that may have served to aid in the commission of violations of the Endangered Species Act, the Lacey Act, or in the smuggling of goods into the United States, including but not limited to storage containers and packing materials with The British Store logo or markings;

6.      All wildlife of foreign origin, including parts and products thereof;

7.      Notes, documents, records, bills, or correspondence, in any format, concerning bank accounts or online financial records, including online payment services or credit card processing services, that may relate to violations of the Endangered Species Act, the Lacey Act,

or smuggling violations, and disposition of proceeds, including cash made from the sale of illegally trafficked wildlife;

8.      All records, documents, invoices, notes, and materials that pertain to accounts with any Internet Service Provider (ISP), as well as all records relating to the ownership or use of any computer equipment found, including but not limited to correspondence, sales receipts, bills for internet access, financial records, tax records, personal photographs, telephone records, notebooks, diaries, reference materials, or other personal items, and registration information for any software on the computer;

9.      All computer passwords, keywords and other data security devices designed to restrict access to or hide computer software, documentation or data. Data security devices may consist of hardware, software, or other programming code. Any password or encryption key that may control access to a computer operating system, individual computer files, or other electronic data.

10.     Evidence and contents of logs and files on a computer or storage device, such as those generated by the computer's operating system, which describes the history and use of the device, including but not limited to files indicating when files were written, were opened, were saved, or were deleted. Evidence tending to show the identity of the person using the computer at the time any records or communications related to the Endangered Species Act, the Lacey Act, or smuggling violations was created, sent, received, or viewed. Also, any malware resident on the computer.

11.     Records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses pertaining to the violations noted above.

12.     Evidence of the attachment of other storage devices or similar containers for electronic evidence to any computer or electronic device seized.

The following may be seized and searched for all items listed above:

•       Computer hardware, meaning any and all computer equipment. Included within the definition of computer hardware are any electronic devices capable of data processing (such as central processing units, laptop or notebook or netbook or tablet computers, personal digital assistants, gaming consoles, and wireless communication devices to include cellular telephone devices capable of internet access); peripheral input/output devices (such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media); related communications devices (such as modems, wireless routers, cables and connections); storage media, defined below; and security devices, also defined below.

•       Computer software, meaning any and all data, information, instructions, programs, or program codes, stored in the form of electronic, magnetic, optical, or other media, which is capable of being interpreted by a computer or its related components. Computer

software may also include data, data fragments, or control characters integral to the operation of computer software, such as operating systems software, applications software, utility programs, compilers, interpreters, communications software, and other programming used or intended to be used to communicate with computer components.

- Computer related documentation, meaning any written, recorded, printed, or electronically stored material that explains or illustrates the configuration or use of any seized computer hardware, software, or related items.

- Data security devices, meaning any devices, programs, or data -- whether themselves in the nature of hardware or software -- that can be used or are designed to be used to restrict access to, or to facilitate concealment of, any computer hardware, computer software, computer related documentation, or electronic data records. Such items include, but are not limited to, user names and passwords; data security hardware (such as encryption devices, chips, and circuit boards); data security software or information (such as test keys and encryption codes); and similar information that is required to access computer programs or date or to otherwise render programs or data into usable form.

- All storage media capable of collecting, storing, maintaining, retrieving, concealing, transmitting, and backing up electronic data or storing an operating system. Included within this paragraph is any information stored in the form of electronic, magnetic, optical, or other coding on computer media or on media capable of being read by a computer or computer related equipment, such as fixed hard disks, external hard disks, removable hard disks (including micro drives), floppy diskettes, compact disks (CDs), digital video disks (DVDs), tapes, optical storage devices, laser disks, thumb drives, iPods, iPads, iPhones, smart phones, digital cameras, memory cards (e.g. CF or SD cards), Xboxes, flash drives, or other memory storage devices. This also includes areas with digital storage capability on devices such as printers, scanners, wireless routers, etc.

The above seizure of computer and computer related hardware relates to such computer related items as being the instrumentalities of crime and also to allow for analysis/search for evidence of crime in an appropriate forensic setting. Upon a determination that such examination would be more appropriately made in a controlled environment, this storage media may be removed and examined at a laboratory location.

During the execution of this search warrant, the law enforcement personnel are authorized to depress the fingerprints and/or thumbprints of persons at the locations to be searched onto the Touch ID sensor of any Apple iPhone, iPad, or other Apple brand device with Touch ID in order to gain access to the contents of any such device.

During the course of the search, photographs of the searched premises may also be taken to record the condition thereof and/or the location of items therein.



IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

UNDER SEAL

IN THE MATTER OF THE SEARCH OF      )
INFORMATION ASSOCIATED WITH         )          NO. 1:17sw 235
EMAIL ACCOUNTS STORED AT            )
SITEGROUND.COM, INC.                )

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Stuart G. Curtin, Jr., being first duly sworn, hereby depose and state as follows:

1.    I am a Special Agent employed by the United States Fish and Wildlife Service

("FWS"), Office of Law Enforcement, in Richmond, Virginia and an "investigative or law

enforcement officer" of the United States within the meaning of Section 3375 of Title 16 of the

United States Code ("U.S.C.") and Federal Rule of Criminal Procedure 41(a), authorized to

investigate violations of laws of the United States and execute warrants issued under the

authority of the United States. I have been employed by the FWS as a Special Agent for

approximately one year. Prior to my employment as a Special Agent with the FWS, I served as a

law enforcement officer for the National Park Service for approximately 13 years. I have

received specialized training and possess experience in the enforcement of federal laws,

including the Endangered Species Act ("ESA"), 16 U.S.C. § 1531, *et seq.* and the Lacey Act, 16

U.S.C. § 3371, *et seq.* My duties also include the enforcement of regulations of the Convention

on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"), an

international treaty to which the United States is a signatory. I have participated in numerous

federal investigations, either as a case agent/officer or in various support roles, including

investigations involving the unlawful purchase, smuggling, transport, possession, and sale of

wildlife. I have participated in the service of arrest and search warrants.

2.     I make this affidavit under 18 U.S.C. § 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) in support of an application for a warrant to search the electronic e-mail accounts **keith@theoutpostmiddleburg.com, lauren@theoutpostmiddleburg.com,** and **info@theoutpostmiddleburg.com,** stored in servers controlled by SiteGround.com, Inc. ("SiteGround") for the information (including the content of communications) further described in Attachment A.  Based on the facts contained herein, there is probable cause to believe within the contents of these accounts are e-mail transactional records, communications, messages, and other information, more particularly described in Attachment A of this affidavit, regarding the sale in interstate commerce of endangered species previously smuggled into the United States and a conspiracy to engage in the further smuggling and sale of protected wildlife, in violation of 16 U.S.C. § 1538 (the ESA), 16 U.S.C. § 3372-3373 (the Lacey Act), and 18 U.S.C. § 545.

3.     The facts set forth in this affidavit are based on my personal knowledge and observations made during the course of this investigation, information conveyed to me by other law enforcement officials, and personal review of records, documents, and other physical evidence obtained during this investigation.  This affidavit contains information necessary to support probable cause.  It is not intended to include every fact and matter observed by me or known to the United States Government.  When I write that an e-mail or text message was transmitted on a specific date, I mean that the message was transmitted "on or about" the time and date specified.

## THE RELEVANT STATUTES

4.     The Endangered Species Act was enacted to provide a program for the conservation of endangered and threatened species.  Pursuant to 16 U.S.C. § 1538(a)(1)(A), it is unlawful for any person subject to the jurisdiction of the United States to import any endangered species into the United States.  Pursuant to 16 U.S.C. § 1538(a)(1)(E), 1540(b) the ESA makes it unlawful for

2

any person to knowingly deliver, receive, carry, transport, or ship in interstate or foreign commerce, by any means whatsoever and in the course of a commercial activity, any endangered species. Pursuant to 16 U.S.C. § 1538(a)(1)(F), the ESA makes it unlawful for any person to sell, or offer for sale, an endangered species in interstate commerce. Under the ESA, the term "endangered species" includes any species, or part thereof, included on the "List of Endangered or Threatened Wildlife," found in 50 Code of Federal Regulations ("CFR") Part 17.11.

5.    Smalltooth sawfish (*Pristis pectinata*) are listed as "endangered" under 50 CFR 17.11, with U.S. populations being so listed since 2005 and non-U.S. populations being so listed since 2015. See Federal Register ("FR") Notices 70 FR 69464-69466 (2005) and 79 FR 3914-3916 (2015). Largetooth sawfish (*Pristis pristis*) are listed as "endangered" under 50 CFR 17.11 and have been so listed since 2014. See 79 FR 42687, 42696. Green sawfish (*Pristis zijsron*) and narrow sawfish (*Anoxypristis cuspidata*) are listed as "endangered" under 50 CFR 17.11 and have been so listed since 2015. See 79 FR 3914-3916 (2015).

6.    Hawksbill sea turtles (*Eretmochelys imbricate*) are listed as "endangered" under 50 CFR 17.11 and have been so listed since 1970. See 35 FR 8465; 8491-8498 (1970). Green sea turtles (*Chelonia mydas*) are listed as "endangered" or "threatened" (depending on geographic area) under 50 CFR 17.11 and have been so listed since 1978. See 43 FR 32808 (1978).

7.    Nearly every species of the crocodile family (*Crocodylidae*) are listed as either "endangered" or "threatened" (depending on species and geographic area) under 50 CFR 17.11. Many of which have been listed as such since the 1970s (various FRs).

8.    Pursuant to 16 U.S.C. § 3372(a)(1), the Lacey Act makes it unlawful for a person to import, export, transport, sell, receive, acquire, or purchase any fish or wildlife, taken, possessed, transported, or sold in violation of any United States law or treaty of the United States.

3

9.    Pursuant to 18 U.S.C. § 545, it is unlawful to fraudulently or knowingly import or bring into the United States, any merchandise contrary to law, or receive, conceal, buy, sell, or in any manner facilitate the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law.

10.    I am advised that, pursuant to 18 U.S.C. § 2703(a), a Court with jurisdiction over the offenses that are under investigation has authority to issue a warrant to compel disclosure of stored content and records and other information pertaining to a customer or subscriber of an ECS/RCS from an internet service provider ("ISP") including an ISP located physically in another judicial district.  Accordingly, this Court has the authority to issue warrants to SiteGround for stored content and records and other information pertaining to their subscribers even though that business is located in Illinois.

**PROBABLE CAUSE**

11.    Keith R. Foster ("K. Foster") is a 59-year old United States citizen who resides in Upperville, Virginia.  K. Foster and his wife, Pamela J. Foster ("P. Foster") own and operate a business called The Outpost, located at 6 South Madison Street in Middleburg, Virginia.

12.    The Outpost sells home furniture, antiques, and home décor pieces, including a variety of wildlife mounts and handicrafts made from wildlife parts.  Most everything sold at The Outpost is advertised to be of foreign origin.  The Outpost advertises items for sale on a company website **www.theoutpostmiddleburg.com**, as well as on their company Facebook page and company Instagram page.  The Outpost specializes in British campaign merchandise.

13.    The Fosters make multiple buying trips abroad each year to source and purchase items in foreign commerce, which are later sold at The Outpost.  According to FWS records, neither K. Foster, nor P. Foster, nor The Outpost, is a federally-licensed importer or exporter of wildlife.

4

14.     Lauren A. Rhodes ("Rhodes") is a 34 year-old United States citizen who resides in Middleburg, Virginia and is an employee at The Outpost. According to FWS records, Rhodes is not a federally-licensed importer or exporter of wildlife.

15.     On November 21, 2016, the FWS received an anonymous complaint alleging that The Outpost was advertising for sale protected wildlife items. A check of The Outpost website revealed they were in fact offering for sale various protected wildlife items, to include a sawfish blade (or rostrum)[1] and numerous mounted birds. All wildlife listed for sale on The Outpost website was labeled as foreign. The Outpost website stated that they sell and ship items worldwide.

16.     On December 2, 2016, two undercover FWS agents visited The Outpost. Audio from the visit was recorded by the FWS. During the visit, the undercover agents ("UC1" and "UC2") observed numerous wildlife pieces for sale at The Outpost, including ESA items such as a sawfish blade, crocodile skin wallets and flasks, and handicrafts labeled as tortoiseshell, which appeared to be made of sea turtle shell. UC1 and UC2 observed that all wildlife for sale in the store was labeled as foreign. When UC2 asked about the sawfish blade advertised for sale, K. Foster told UC1 and UC2 that the blade was from England. K. Foster further explained that he and P. Foster travel abroad multiple times a year to buy and import items for The Outpost.

17.     On December 10, 2016, UC1 sent an email to the email account keith@theoutpostmiddleburg.com, in which UC1 asked for more information regarding two items listed for sale at The Outpost. Those two items were a sawfish blade and a mother-of-pearl inlaid table. Both items were previously observed by UC1 and UC2 during the December 2nd site visit. In the email, UC1 inquired about authenticity paperwork for each piece and about

---

1 A sawfish rostrum is an elongated, boney growth that extends from the upper jaw and contains tooth-like structures. A rostrum resembles a saw and is often called a blade.

shipping options, as UC1 stated that he lived in Philadelphia, Pennsylvania. UC1 included in the email a hyperlink for each piece offered for sale, taken directly from The Outpost website.

18. On December 10, 2016, UC1 received a reply from **keith@theoutpostmiddleburg.com**. In the email, K. Foster explained that he purchased both pieces while traveling abroad in 2016 and stated that he didn't have any authenticity paperwork for either piece. K. Foster wrote that he purchased six sawfish blades in 2016, while in England, and imported four of them during the spring of 2016, which he subsequently sold. K. Foster stated he imported an additional two sawfish blades on or about November 2016. K. Foster offered to ship both items to Pennsylvania and stated that no sales tax would be charged for the out-of-state sale. The email was signed "Keith."

19. On December 10, 2016, UC1 received a second email from **keith@theoutpostmiddleburg.com**. In the email, K. Foster offered to sell the sawfish blade to UC1 for $1,000 and the mother-of-pearl table to UC1 for $1,150. K. Foster stated that no tax would be charged for the sale and offered to ship the items to Pennsylvania for $250, but also offered to deliver the two items to UC1 in Pennsylvania for $250. The email contained four photographs which showed the sawfish blade resting on top of the mother-of-pearl table.

20. On December 10, 2016, UC1 received a third email from **keith@theoutpostmiddleburg.com**. In the email, K. Foster offered to drive the sawfish blade and the mother-of-pearl table to UC1 in Pennsylvania.

21. On December 13, 2016, UC1 sent an email to the email account **keith@theoutpostmiddleburg.com**. In the email, UC1 asked K. Foster to hold the sawfish blade and mother-of-pearl table for him to purchase at a later date. Additionally, UC1 asked K. Foster if he had any other sawfish blades for sale and stated that he would be interested in purchasing additional sawfish blades, if available.

22.    On December 13, 2016, UC1 received a reply email from

**keith@theoutpostmiddleburg.com**. In the email, K. Foster stated that he was traveling but that

his employee "Lauren" would hold both pieces for UC1 to purchase. K. Foster wrote that the

sawfish blade presently being offered for sale was the last he had, but he planned to return to

England and purchase three additional sawfish blades. K. Foster then wrote "they are extremely

difficult to bring in States by the way." The email address **lauren@theoutpostmiddleburg.com**

was carbon copied in the email and of the recipient was listed as "Lauren A. Rhodes."

23.    On December 15, 2016, UC1 received an email from **keith@theoutpost**

**middleburg.com**. In the email, K. Foster said the total price for both the sawfish blade and the

mother-of-pearl table was $2,150. K. Foster went on to explain that the Fosters would be

traveling abroad from January 10 – February 28, 2017, to purchase items for The Outpost. K.

Foster stated that Rhodes could handle the rest of the sale and that she would work up a shipping

estimate for UC1. **Lauren@theoutpostmiddleburg.com** was carbon copied in the email.

24.    On December 15, 2016, UC1 received a second email from **keith@theoutpost**

**middleburg.com**. In the email, K. Foster told UC1 that the shipping charge to send the two

items to Pennsylvania would be $275. K. Foster asked UC1 to call The Outpost to pay for the

sawfish blade and mother-of-pearl table, with a credit card. **Lauren@theoutpost**

**middleburg.com** was carbon copied in the email.

25.    On December 21, 2016, UC1 received an email from **keith@theoutpostmiddle**

**burg.com**. In the email, K. Foster asked UC1 to "call Lauren today at shop, 540-687-4094" to

pay for the two items. **Lauren@theoutpostmiddleburg.com** was carbon copied in the email.

26.    On December 21, 2016, UC1 called The Outpost and spoke with a female who

identified herself as "Lauren." The phone conversation was recorded. During the conversation,

Rhodes told UC1 that the total for the two pieces would be $2,150 and would include no tax

"since you're out-of-state." During the conversation, UC1 purchased one sawfish blade for $1,000 and one mother-of-pearl table for $1,150, via covert credit card. UC1 asked Rhodes if he could pick the two items up after Christmas, rather than ship them. Rhodes agreed to hold the items for pickup. Rhodes told UC1 that a receipt for purchase would be emailed to him. After the phone conservation concluded, UC1 received an email titled "Receipt/Tax Invoice" from no-reply@vendhq.com, which contained a receipt for the purchase of the sawfish blade and mother-of-pearl table. The receipt was labeled as having come from "THE OUTPOST LLC" and was numbered "Invoice #1336."

27.    On December 28, 2016, UC1 traded emails with **lauren@theoutpostmiddle burg.com** regarding the pickup of the two items. Rhodes told UC1 she was available any time to meet him. The email was signed "Lauren."

28.    On January 2, 2017, UC1 received an email from pamfosteroutpost@msn.com. In the email, P. Foster thanked UC1 for his recent purchase of the sawfish blade and the mother-of-pearl table. The email was signed "Keith, Pam, and Lauren" and contained contact information for The Outpost, to include a business address, phone number, and website address.

29.    On January 3, 2017, UC1 sent a reply email to pamfosteroutpost@msn.com, in which UC1 stated he would like to have a courier pick up the two items on January 4, 2017. UC1 explained that the courier would be coming from Maryland and would transport the two items to Pennsylvania after pickup.

30.    On January 3, 2017, UC1 received an email from **keith@theoutpostmiddle burg.com**, which stated that Rhodes would be working at The Outpost on January 4th and would assist with the courier pickup. The email included The Outpost phone number. **Lauren@theoutpostmiddleburg.com** was carbon copied in the email.

31.   On January 4, 2017, an undercover FWS agent (unknown to Rhodes) visited The Outpost to pick up the two items previously purchased by UC1 on December 21st.  The undercover agent ("UC3") met with Rhodes, who assisted in putting the two items into UC3's vehicle (which displayed a Maryland license plate).  Audio from the visit was recorded by the FWS.  During the meeting, Rhodes told UC3 that the sawfish blade was from England and had been previously purchased and imported by K. Foster.  Rhodes told UC3 that nearly everything at The Outpost was foreign and imported directly by The Outpost.  Rhodes bragged about recently selling mounted hawks, falcons, and owls.

32.   Rhodes showed UC3 numerous wildlife items for sale, to include crocodile skin items that The Outpost "have to smuggle in."  UC3 asked Rhodes to clarify her comment, at which time Rhodes again stated "yup we smuggle it."  Rhodes further explained that The Outpost has "only ever had one thing caught, which I think is pretty good" considering the "interesting things we import."  Rhodes also told UC3 about other smuggled illicit wildlife including ivory pieces. Rhodes explained to UC3 that The Outpost primarily imports wildlife pieces via cargo container and that the shipping company used by The Outpost often conceals and hides items within cargo containers in order to smuggle said items into the United States.

33.   On January 6, 2017, UC1 called The Outpost and spoke with K. Foster.  The phone conversation was recorded.  During the conversation, K. Foster told UC1 that he would be out of the country for seven weeks on a buying trip for The Outpost and offered to email UC1 photographs of merchandise while traveling abroad.  In reference to the sawfish blade, K. Foster told UC1 "In truth I shouldn't be bringing those in. Cause, you know, um, they're...I mean, Fish and Wildlife, if they opened up that, and found it, you know, they would confiscate my whole container...so that's a problem."  K. Foster continued by saying, "and even if you try and get a CITES [permit], you just can't."

9

34.   K. Foster told UC1 that last year he purchased six sawfish blades which he subsequently smuggled into the United States and sold, and that he plans to return to England to purchase more and bring them in among one of his four to five cargo shipments he receives every year. K. Foster told UC1, "If I don't get it [the sawfish blades] on my first shipment, I'll certainly get it on my second."

35.   Regarding wildlife smuggling, K. Foster told UC1, "There are always two things that I want. It's just a matter of how, how risky I want to be." K. Foster went on to say he has previously imported tortoise shells, up to 36 inches in size and stated, "They're endangered, so you know, they're a problem bringing those in." K. Foster told UC1 that he has pre-ordered sawfish blades from a collector in England and stated "rest assured. I'm gonna bring more in. Cause I'm the only fool in the States that probably wants to risk it."

36.   K. Foster explained to UC1 exactly how he smuggles wildlife via cargo containers and stated, "I can hide it. I hate to say it this way, but I can hide, through my shipper, you know, some of this." K. Foster explained that items like the sawfish blades are wrapped and boxed in a way that conceals them so "you're not going to find it and nothing is going to happen to it."

37.   On January 12, 2017, UC1 exchanged emails with lauren@theoutpostmiddleburg.com in which Rhodes told UC1 that K. Foster was in England traveling, but that Rhodes would be working at The Outpost on the following day.

38.   On January 13, 2017, UC1 and UC2 conducted a site visit to The Outpost, where UC1 met with Rhodes. Audio from the visit was recorded by the FWS. Rhodes was told that UC1 was from Pennsylvania and had traveled to The Outpost that morning. During the visit, Rhodes showed UC1 numerous wildlife pieces for sale at The Outpost including ESA protected wildlife to include tortoiseshell and sea turtle pieces, and pieces made from crocodile skin. Rhodes told

UC1 that The Outpost smuggled the sea turtle and crocodile pieces into the United States because the items are protected and prohibited from importing.

39.     During the visit on January 13, 2017, Rhodes sold UC1 a box made from sea turtle shell, a flask and a case made from crocodile skin, and a duster made from ostrich feathers. Rhodes stated that the sale to UC1 would be tax free and said "we'll just say we're shipping it to you." UC1 paid $1,073 cash for the items and Rhodes provided him with a receipt from "THE OUTPOST LLC" and numbered "Invoice #1271." Rhodes further told UC1 that she was traveling to England the following week to join the Fosters on a buying trip. Rhodes stated that she and the Fosters intended to purchase wildlife items while in England and subsequently import them into the United States to sell them at The Outpost.

40.     On January 14, 2017, UC1 sent an email to **keith@theoutpostmiddleburg.com**. In the email, UC1 told K. Foster about the prior days visit to The Outpost. Later that day, UC1 received a reply email from **keith@theoutpostmiddleburg.com**. In the email, K. Foster told UC1 that he and P. Foster were in England, waiting for Rhodes to arrive to help the Fosters begin their buying trip. K. Foster then told UC1 that he was "sure I will be able to buy a couple of Sawfish blades."

41.     On February 2, 2017, a forensic scientist at the FWS National Wildlife Forensics Laboratory ("NWFL") confirmed that the sawfish blade purchased by UC1 on December 21, 2016 appeared authentic and consistent with a rostrum of a smalltooth sawfish or green sawfish.

42.     On February 16, 2017, UC1 received an email from **info@theoutpostmiddle burg.com**, which stated that the Fosters had just completed their first buying trip of 2017 and that a cargo container of merchandise was in route from England to the United States.

43.     On March 2, 2017, a forensic scientist at the FWS NWFL confirmed that the tortoiseshell box purchased by UC1 on January 13, 2017 was in fact authentic and made from

11

either hawksbill sea turtle shell or green sea turtle shell. It was also confirmed that the two crocodile pieces purchased by UC1 on January 13, 2017 were in fact authentic and made from a species in the crocodile family.

44.   On March 4, 2017, an undercover FWS agent (unknown to The Outpost) sent an email to **info@theoutpostmiddleburg.com** asking about a mounted grey heron advertised for sale on The Outpost website. The heron was previously observed by UC1 during the January 13th site visit. The undercover agent ("UC4") received a response email from **keith@theoutpostmiddleburg.com** which stated the bird was a real heron. In the email, K. Foster offered to sell the heron to UC4 for $975. K. Foster further stated in an additional email that the heron was purchased "quietly" from a collector in England and told UC4 that The Outpost has multiple taxidermy cases for sale.

45.   On March 9, 2017, a team of FWS agents conducted an inspection of a cargo container in Norfolk, Virginia. The 40 foot container housed items being imported from Southampton, England into the United States and all contents of the container belonged to The Outpost. During the inspection, FWS agents documented approximately 100 undeclared wildlife items contained within boxes inside the container. Many of the undeclared items are protected by the ESA and CITES, to include numerous pieces made from sea turtle shell. FWS agents covertly marked all wildlife, repackaged the items, and allowed the container to enter the United States and travel to The Outpost. The container invoice was prepared by The British Shop.[2] The invoice listed The Outpost as the sole owner of the contents of the container and listed the consignee as TBS Tramo. None of the wildlife observed by FWS was listed on the invoice.

---

2 The British Shop is a worldwide freight forwarding company based in England that specializes in the shipment of high-end furniture, antiques, and artwork. They have multiple offices in the United States under the name TBS Tramo, Inc.

46.     On March 23, 2017, UC1 received an email from

**lauren@theoutpostmiddleburg.com**.  In the email, Rhodes offered to sell two pieces made

from sea turtle shell to UC1 for $415, knowing that UC1 was from Pennsylvania. The email from

Rhodes included photographs of the two pieces, which were previously known to FWS agents

and had been photographed and covertly marked during the March 9th inspection.

47.     On April 6, 2017, UC1 received an email from **lauren@theoutpostmiddleburg.com,**

which stated that two sawfish blades arrived on The Outpost's second cargo shipment and were

available for purchase.  UC1 subsequently phoned The Outpost and spoke with Rhodes. The

phone conversation was recorded.  During that conversation, Rhodes told UC1 that the second

shipment contained smuggled wildlife to include sawfish blades, crocodile skin bags, and

numerous African animal mounts.  Rhodes then sent numerous photographs via text message to

UC1 of various wildlife items for sale at The Outpost, to include several wildlife items

previously known to the FWS from the March 9th inspection, as well as new wildlife items

smuggled into the United States on or around March 29, 2017 via cargo container.

48.     On April 6, 2017, UC1 received an email from **info@theoutpostmiddleburg.com,**

which stated that the second shipment of the year had just arrived at The Outpost.  The email

contained several photographs of wildlife items for sale at The Outpost, to include several

wildlife items previously known to the FWS from the March 9th inspection, as well as new

wildlife items smuggled into the United States on or around March 29, 2017 via cargo container.

49.     On April 12, 2017, UC1 and UC2 conducted a site visit to The Outpost.  During the

visit, UC1 met with K. Foster and Rhodes.  Audio from the visit was recorded by the FWS.

During the visit, K. Foster and Rhodes showed UC1 numerous wildlife pieces for sale, including

sawfish blades, turtle shell, ivory, zebra hide, crocodile, and various birds and bird parts. K.

Foster told UC1 about smuggling wildlife, about lacking the proper CITES permits to purchase,

export, and later import some protected wildlife, and about the dangers of being caught by United States Customs. K. Foster, Rhodes, and UC1 also discussed the Philadelphia area and travel to and from the Pennsylvania. K. Foster and Rhodes sold UC1 three sawfish blades, one mounted barn owl, one tortoiseshell jar, one turtle shell box, one African antelope mount, and one porcupine quill box. The total for the sale was $5,420 which UC1 paid for with a covert credit card. No sales tax was charged. Rhodes provided UC1 with a receipt from "THE OUTPOST LLC" and numbered "Invoice #1865." Rhodes wrapped one of the sawfish blades in packing material that contained a sticker from The British Shop. UC1 loaded all of the items into his vehicle (which displayed a Pennsylvania license plate).

50.     UC1 had prior knowledge of the sea turtle and tortoise pieces, the barn owl, the African antelope, and the porcupine quill box, as he had documented, photographed, and covertly marked them during the March 9th inspection. K. Foster and Rhodes told UC1 that two of the sawfish blades were smuggled in the second container which arrived into the United States on or around March 29, 2017 at a port in New York, New York. The contents of the container were later transported to Virginia. K. Foster and Rhodes told UC1 that the third sawfish blade was previously imported in 2016.

51.     On April 27, 2017, a forensic scientist at the FWS NWFL confirmed that the three sawfish blades purchased by UC1 on April 12, 2017 appeared authentic and consistent with the rostrums of a largetooth sawfish, a green sawfish, and a narrow sawfish, respectively.

52.     Based on the foregoing, there is probable cause that K. Foster, P. Foster, and Rhodes have engaged in the sale in interstate commerce of endangered species previously smuggled into the United States and a conspiracy to engage in the further smuggling and sale of protected wildlife, in violation of 16 U.S.C. §1538 (the ESA), 16 U.S.C. § 3372-3373 (the Lacey Act), and 18 U.S.C. § 545. Further, there is probable cause that evidence of these offenses are contained in

14

messages at the email addresses **keith@theoutpostmiddleburg.com,**

**lauren@theoutpostmiddleburg.com,** and **info@theoutpostmiddleburg.com.**

53.     Based on my training and experience, I know that companies and individuals that

conduct commercial activity via the Internet often email customers receipts for on-line and

phone purchases.  I further know that it is becoming commonplace for companies and

individuals who conduct commercial activity to even email receipts to customers for in-store

purchases.

54.     Particularly in light of the time difference between England and the United States, I

know that email is a popular tool for people in the United States who seek to communicate with

people in England.  Based on my training and experience, I know that an individual in the United

States who regularly purchases merchandise from England needs to communicate regularly with

merchants and partners located in England to arrange for purchases, as well as the transport and

shipment of goods from England back to the United States.   I also know that an individual in the

United States who seeks to purchase merchandise from individual sellers in England and other

foreign countries is likely to arrange meeting dates and locations prior to traveling to that

particular foreign country.

55.     Based on my training and experience, I know that an individual in the United States

that owns or operates a business that specializes in foreign merchandise needs to regularly

communicate with shipping companies which are utilized to export items from the foreign

county and eventually import those items into the United States.  I also know that shipping

companies regularly utilize email to send customers quotes, invoices, and tracking information

regarding shipments.

56.     Based on my training and experience, I know that it is common for United States

citizens who travel abroad to make travel arrangements such as booking airfare, hotels, and

rental vehicles by utilizing the Internet. I know that it is common for travel itinerates to be emailed to travelers.

57. For these reasons, I believe it likely that the email accounts **keith@theoutpostmiddleburg.com, lauren@theoutpostmiddleburg.com,** and **info@theoutpostmiddleburg.com** will contain messages regarding the purchase, transport, and sale of endangered species and other wildlife; the smuggling of said endangered species and other wildlife into the United States from foreign counties; and the conspiracy to engage in the further smuggling and sale of protected wildlife.

## BACKGROUND REGARDING COMPUTERS, THE INTERNET, AND E-MAIL

58. I have learned through my investigation and from other law enforcement personnel who are familiar with computer and Internet forensics that WHOIS (pronounced as the phrase who is) is a query and response protocol (accessible at whois.icann.org) that is widely used for querying databases that store the registered users or assignees of an Internet resource, such as a domain name, or an IP address block. According to WHOIS, the domain www.theoutpostmiddleburg.com is registered to K. Foster, doing business as The Outpost at 6 Madison Street in Middleburg. Further, according to WHOIS, the domain www.theoutpostmiddleburg.com and the associated electronic mail ("email") addresses with the suffix "@theoutpostmiddleburg.com" are maintained and controlled by SiteGround.

59. In my training and experience, I have learned that SiteGround is a commercial website hosting provider with servers located at 9333 West Grand Avenue, Franklin Park, Illinois. SiteGround provides a variety of fee based on-line services, including electronic mail ("email") access and website hosting. SiteGround allows subscribers to purchase individual domain names and email accounts, like the email accounts listed in Attachment A. Subscribers obtain an account by registering with SiteGround. During the registration process, SiteGround asks

subscribers to provide basic personal information. Therefore, the computers of SiteGround are likely to contain stored electronic communications (including retrieved and unretrieved email for SiteGround subscribers) and information concerning subscribers and their use of SiteGround services, such as account access information, email transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

60.    A SiteGround subscriber can also store with the provider files, in addition to emails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to emails), and other files, on servers maintained and/or owned by SiteGround. In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, email in the account, and attachments to emails, including pictures and files.

61.    In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that even if subscribers insert false information to conceal their identity, I know that this information often provides clues to their identity, location or illicit activities.

62.    In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain

17

records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

63. As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the email provider can show how and when the account was accessed or used. For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the

offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

64.    In general, an email that is sent to a SiteGround subscriber is stored in the subscriber's "mail box" on SiteGround's servers until the subscriber deletes the email. If the subscriber does not delete the message, the message can remain on SiteGround's servers indefinitely. Even if the subscriber deletes the email, it may continue to be available on SiteGround's servers for a certain period of time.

65.    I am trained and experienced in identifying communications relevant to the crimes under investigation, but the personnel of SiteGround are not. I also know that the manner in which the data is preserved and analyzed may be critical to the successful prosecution of any case based upon this evidence. Computer Forensic Examiners are trained to handle digital evidence, but employees of SiteGround are not. It would be inappropriate and impractical, however, for federal agents to search the vast computer networks of SiteGround for the relevant account and then to analyze the contents of that account on the premises of that company. Further, the impact on the business of SiteGround would be severe.

66.    Accordingly, executing a warrant to search an e-mail account at SiteGround requires an approach similar to the standard approach for executing a warrant to search papers stored in a file cabinet. Searching the subject's e-mail account in this case for evidence of the import, purchase, transport, or sale of wildlife will require that agents cursorily inspect all e-mails produced by SiteGround in order to ascertain which contain evidence of that crime, just as it is necessary for agents executing a warrant to search a filing cabinet to conduct a preliminary inspection of its entire contents in order to determine the documents which fall within the scope

19

of the warrant. In addition, keyword searches alone are inadequate to identify all of the information subject to seizure, because keywords search text, but many common electronic mail, database and spreadsheet applications files (which files may have been attached to electronic mail) do not store data as searchable text.

67.     In order to facilitate seizure by law enforcement of the records and information sought through this affidavit and application with a minimum of interference with the business activities of SiteGround, to protect the rights of the subject of the investigation, and to effectively pursue this investigation, this application seeks the issuance of a warrant that would permit employees of SiteGround to assist agents in the execution of this warrant, in accordance with the procedures described in Attachment A to the warrant, which is hereby incorporated into this Affidavit.

68.     In accordance with the procedures described in Attachment A to the warrant:

    a.   The search warrant for the SiteGround accounts will be presented to SiteGround personnel who will be directed to isolate the accounts **keith@theoutpostmiddleburg.com, lauren@theoutpostmiddleburg.com,** and **info@theoutpostmiddleburg.com.**

    b.   In order to minimize any disruption of computer service to innocent third parties, SiteGround employees and/or law enforcement personnel trained in the operation of computers will create and provide to law enforcement personnel in electronic form an exact duplicate of the identified accounts and all information stored in those accounts.

    c.   Law enforcement personnel will thereafter review all information and records received from SiteGround to determine the information to be seized by law enforcement personnel.

    d.   The information to be seized consists of e-mail transactional records, communications, messages, and other information regarding the purchase, transportation, shipping, receipt, possession, transfer, or sale of endangered species and other wildlife; any travel to or from the United States and/or England; the purchase or shipping of foreign merchandise; The British Shop or TBS Tramo Inc.

## CONCLUSION

69.     Based on the foregoing, there is probable cause to believe that, within the contents of

the **keith@theoutpostmiddleburg.com, lauren@theoutpostmiddleburg.com,** and

**info@theoutpostmiddleburg.com** e-mail accounts on the computer systems owned, maintained,

and/or operated by SiteGround, there exist communications, messages, e-mail transactional

records, and other information relevant to the sale in interstate commerce of endangered species

previously smuggled into the United States and a conspiracy to engage in the further smuggling

and sale of protected wildlife, in violation of 16 U.S.C. §1538 (the ESA), 16 U.S.C. § 3372-3373

(the Lacey Act), and 18 U.S.C. § 545.

70.     Wherefore, I request the issuance of a search warrant pursuant to Rule 41 of the

Federal Rules of Criminal Procedure directed to SiteGround allowing agents to seize the

information stored on the servers of those corporation for the account listed above, in accordance

with the search procedure described in Attachment A.

71.     Since this investigation is continuing, disclosure of the search warrant, this affidavit,

and/or this application and the attachments thereto will jeopardize the progress of the

investigation. Accordingly, I request that the Court issue an order that the search warrants, this

affidavit in support of the applications for the search warrants, the applications for the search

warrants, and all attachments thereto be filed under seal until further order of this Court.

FURTHER THIS AFFIANT SAYETH NOT.

Stuart G. Curtin, Jr.
Special Agent, FWS

Subscribed to and sworn before me on this 8th day of May 2017.

/s/
Michael S. Nachmanoff
United States Magistrate Judge
MICHAEL S. NACHMANOFF
UNITED STATES MAGISTRATE JUDGE

21

# ATTACHMENT A

A.  The search warrant will be presented to SiteGround personnel who will be directed to isolate the accounts for the electronic mail addresses **keith@theoutpostmiddleburg.com, lauren@theoutpostmiddleburg.com,** and **info@theoutpostmiddleburg.com.** SiteGround employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the accounts for the electronic mail addresses **keith@theoutpostmiddleburg.com, lauren@theoutpostmiddleburg.com,** including an exact duplicate of all information stored in the computer account and files described therein.

B.  SiteGround shall provide to the agent who serves the search warrant in electronic form the exact duplicate of the accounts for the electronic mail addresses **keith@theoutpostmiddleburg.com, lauren@theoutpostmiddleburg.com,** and **info@theoutpostmiddleburg.com,** and all information stored in those accounts and files, including:

> 1.  All electronic mail stored and presently contained in, or on behalf of, the electronic mail addresses and/or individual accounts **keith@theoutpostmiddleburg.com; lauren@theoutpostmiddleburg.com;** and **info@theoutpostmiddleburg.com.**

> 2.  All existing printouts from original storage of all of the electronic mail described above;

> 3.  All transactional information of all activity of the electronic mail addresses and/or accounts described above, including log files, dates, times, methods of connecting, ports, dial ups, and/or locations;

> 4.  All business records and subscriber information, in any form kept, pertaining to the electronic mail addresses and/or accounts described above, including applications, subscribers full names, all screen names associated with the subscribers and/or accounts, all account names associated with the subscribers, methods of payment, telephone numbers, addresses, and detailed billing records; and

> 5.  All records indicating the services available to subscribers of the electronic mail address and/or account described above.

C.  Law enforcement personnel will thereafter review all information and records received from SiteGround employees to determine the information to be seized by law enforcement personnel.

D. The information to be seized consists of e-mail transactional records, communications, messages, and other information regarding the purchase, transportation, shipping, receipt, possession, transfer, or sale of endangered species and other wildlife; any travel to or from the United States and/or England; the purchase or shipping of foreign merchandise; The British Shop or TBS Tramo Inc.



IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

IN RE: SEARCH WARRANT       )

                                )      No.  1:17sw 778

                                )

## GOVERNMENT'S MOTION TO SEAL THE AFFIDAVIT IN SUPPORT OF SEARCH WARRANT APPLICATION PURSUANT TO LOCAL RULE 49(B)

Pursuant to Local Rule 49(B) of the Local Criminal Rules for the United States District

Court for the Eastern District of Virginia, the United States asks for an Order to Seal the

application for a search warrant (including the affidavit in support of that application), until the

United States makes a motion to unseal it.

I.          REASONS FOR SEALING (Local Rule 49(B)(1))

Premature disclosure of the application for the warrant and the affidavit in support of the

application may jeopardize an ongoing criminal investigation by revealing to targets of the

investigation not only how much the investigators know, but also how much they do *not* know.

Revelation to the targets of an investigation of what the investigators do *not* know may lead such

targets to destroy evidence, tamper with potential witnesses not yet interviewed by investigators,

or shape their own stories to hide what the investigators do not know.

II.    **REFERENCES TO GOVERNING CASE LAW** (Local Rule 49(B)(2))

"The trial court has supervisory power over its own records and may, in its discretion, seal

documents if the public's right of access is outweighed by competing interests." *In re Knight*

*Pub. Co.*, 743 F.2d 231, 235 (4th Cir. 1984). The Court has the inherent power to seal affidavits

in support of warrants to protect an ongoing investigation. *Times Mirror Company v. United*

*States*, 873 F.2d 1210, 1213 n.3 (9th Cir. 1989).  Sealing warrant applications is appropriate where there is a substantial probability that release of the sealed documents would compromise the government's on-going investigation.  *Media General Operations, Inc. v. Buchanan,* 417 F.3d 424, 430-31 (4th Cir. 2005).  *See e.g. In re Search Warrant for Secretarial Area Outside Office of Gunn*, 855 F.2d 569, 574 (8th Cir. 1988).

Sealing should be narrowly tailored to balance the values furthered by sealing (including the protection of ongoing criminal investigations) against the values furthered by unsealing (including the enhancement of the public's ability to evaluate the performance of the investigators).  *Baltimore Sun v. Goetz*, 886 F.2d 60, 65-66 (4th Cir. 1989).  In this case, the investigation cannot be protected without sealing the application.

## II.    PERIOD OF TIME GOVERNMENT SEEKS TO HAVE MATTER REMAIN UNDER SEAL (Local Rule 49(B)(3))

Pursuant to Local Rule 49(B)(3), the application for a search warrant should remain sealed until the United States moves to unseal it.

WHEREFORE, the United States respectfully requests that the application for a search warrant (including the supporting affidavit) be sealed until the United States moves to unseal.

Respectfully submitted,

Dana J. Boente
United States Attorney

By:     _____
        Gordon D. Kromberg
        Assistant United States Attorney



IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

IN RE: SEARCH WARRANT )
                      )         No.   1:17 sw ⁊⁊8
                      )

## ORDER TO SEAL

The UNITED STATES, pursuant to Local Rule 49(B) of the Local Criminal Rules for the United States District Court for the Eastern District of Virginia, having moved to seal the application for a search warrant in this matter; and

The COURT, having found that revealing the material sought to be sealed would jeopardize an ongoing criminal investigation; having considered the available alternatives that are less drastic than sealing, and finding none would suffice to protect the government's legitimate interest in concluding the investigation; and finding that these legitimate interests outweigh at this time any interest in the disclosure of the material; it is hereby

ORDERED, ADJUDGED, and DECREED that the application for a search warrant (including the affidavit in support of that application) be sealed until the United States moves to unseal.

                                            /s/
                                    _____
                                          Ivan D. Davis
                                    United States Magistrate Judge

Date: 13 Nov 17
      Alexandria, Virginia